UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC ZUCKSCHWERDT,

    Plaintiff                                   Civil Action No. 07-11084

v.

                                           District Judge Gerald E. Rosen
                                           Magistrate Judge R. Steven Whalen

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Eric Zuckschwerdt brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits under the Social Security Act. Both parties have filed cross motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment GRANTED to the extent that the case be remanded for an analysis of Plaintiff's non-exertional limitations as required by 20 C.F.R. §404.1520a.

## PROCEDURAL HISTORY

On August 27, 2003, Plaintiff filed an application for Disability Insurance Benefits

("DIB"), alleging an onset date of March 15, 2002 (Tr. 48). After the initial denial of benefits on December 3, 2003, he made a timely request for an administrative hearing, held before Administrative Law Judge ("ALJ") Patricia Hartman on February 28, 2005 in Lansing, Michigan (Tr.36, 204). Plaintiff, represented by Mikel Lupisella, testified, as did Vocational Expert ("VE") Heather Benton (Tr. 209-230, 230-235). On August 12, 2005, ALJ Hartman determined that Plaintiff was not disabled (Tr.28). On March 2, 2007, the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review of the final decision on March 14, 2007.

## BACKGROUND FACTS

Plaintiff, born May 17, 1973, was age 32 when ALJ Hartman issued her decision (Tr. 48). He completed high school and year of college, working previously as an assembler and performing retail functions for an optician (Tr. 66, 69). Plaintiff alleges disability as a result of reflex sympathetic dystrophy ("RSD") and fibromyalgia (Tr. 65).

### A. Plaintiff's Testimony

Plaintiff testified that he stood 6' 4" and weighed 256 pounds (Tr. 209). He estimated that he had gained 60 pounds since becoming disabled (Tr. 209). Plaintiff reported that he was supported by a Workers' Compensation settlement as well as his wife's income (Tr. 209-210). He stated that he dropped out of college to work as an auto assembler and later obtained a job with an optician (Tr. 210). Plaintiff estimated that the work for the optician required him to lift a maximum of 10 pounds and stand or walk for approximately four hours per eight hour shift (Tr. 211). He testified that absenteeism due to illness obliged him to quit

(Tr. 211).

Plaintiff reported that before working for the optician, he performed assembly work for General Motors until sustaining a workplace injury (Tr. 212). Before working for General Motors, he worked as a sales consultant at a hardware store and as a computer consultant with Radio Shack (Tr. 212). Plaintiff estimated that the hardware store position required him to lift up to 75 pounds (Tr. 212).

Plaintiff alleged disability as a result of tension in his neck, back, shoulder, and right hand and arm (Tr. 214). He indicated further that arm, neck, and back swelling caused migraine headaches and sleep disturbances (Tr. 214). He testified that his discomfort level currently ranged anywhere between a "1" and "9" on a 1 to 10 scale (Tr. 214). Plaintiff characterized his pain directly following his 1995 workplace injury as a "10" (Tr. 218). He added that his discomfort was intensified by cold weather (Tr. 219).

Plaintiff reported that his back problems were being treated with medication and physical therapy, but stated that his "sensitivity" to medication made him "loopy," limiting his ability to manage pain (Tr. 215-216). He also expressed concern that pain medications would interfere with his ability to care for his two-year old child, indicating that he took medication only when experiencing severe pain (Tr. 217-218, 227). Plaintiff alleged that he could stand for up to 20 minutes, sit for 40, and lift at least 24 pounds, but denied that he could squat or stoop[1] (Tr. 220). He testified that his physical problems had affected him

---

[1] In response to questioning by his attorney, Plaintiff later alleged that he was unable to lift more than 10 pounds on a regular basis (Tr. 228).

mentally "[i]n some respects," but denied that he was currently taking medication for depression (Tr. 220). He reported that he had experienced "visual twitching" in the past few months but denied hearing problems (Tr. 222).

Plaintiff estimated that he read for two hours each day and watched television for seven (Tr. 220-221). He alleged memory problems, but denied difficulty "following the story line on the TV shows." (Tr. 221). He indicated that he continued to socialize with friends and/or family several times each week (Tr. 221-222). Plaintiff reported that on a typical day, he would get up between 8:30 and 9:30 a.m. and retire anytime between 11:00 p.m. and 2:30 a.m. (Tr. 222-223). He stated that his activities included playing with his daughter, preparing meals, and washing dishes (Tr. 223). He indicated that he continued to take overnight fly fishing trips one to three times each year (Tr. 224). Plaintiff alleged that his condition prevented him from playing more than "a couple" holes of golf (Tr. 224). He reported that his ability to groom himself was compromised by his "shaky" hand, but was able to vacuum, dust, wash towels, perform yard work, and shop for food (Tr. 225-226).

In response to questioning by his attorney, Plaintiff testified that he experienced level "10" pain and numbness in his right hand, adding that he was able to keyboard by "do[ing] everything with the left hand (Tr. 228-229). Plaintiff reported difficulty manipulating zippers and buttons (Tr. 229). He testified that he was bedridden as a result of his condition 10 entire days each month (Tr. 230).

### B. Medical Evidence

### 1. Treating Sources

In June, 1995, Plaintiff sought emergency treatment after injuring his right arm at work in an air gun malfunction (Tr. 159). Plaintiff received a splint and pain medication (Tr. 160). Stephen Burton, M.D. noted the same month that Plaintiff experienced mild finger numbness (Tr. 150). Plaintiff under went occupational therapy on a semi-weekly basis in June and July, 1995 (Tr. 157). In August, 1995, Plaintiff complained of finger stiffness (Tr. 150). November nerve conduction studies showed normal results (Tr. 153). Results of a bone scan performed the same month indicated that "findings suggest probable Tenosynovitis rather than RSD" (Tr. 152). Plaintiff reported continued "glove like numbness" (Tr. 148). In December, 1995, orthopedist Fred M. Hankin, M.D., noting that Plaintiff injured his right arm a few months earlier in a workplace accident, commented that a bone scan "demonstrated no marked changes consistent with a reflex dystrophy or fracture" (Tr. 142). Dr. Hankin, noting normal x-rays of Plaintiff's wrist and an absence of right forearm atrophy, advised against surgery (Tr. 141-142). He opined that Plaintiff "would benefit from a comprehensive pain clinic program, including psychological testing and treatment for his reaction to his work related injury" (Tr. 141).

In December, 1997, Dr. Burton noted that the hand appeared unchanged with "mild generalized swelling throughout the hand and fingers" (Tr. 144). He recommended that Plaintiff continue to remain off work (Tr. 144). In April, 2002, Robert Roty, M.D., noting Plaintiff's complaints of arm and neck pain, prescribed physical therapy (Tr. 113-114). In November, 2002, Dr. Roty wrote a two-week work release, stating that Plaintiff experienced

renewed muscle spasms (Tr. 111). In December, 2002, Matthew Hettle, M.D. discussed "the psychological effects of getting out of the work force" in response to Plaintiff's suggestion that he stop working (Tr. 105). The same month, Hettle noted that Plaintiff claimed "odd" side effects from a low dose of Neurontin, including discoordination, visual problems, and increased pain (Tr. 102).

In September, 2003, Dr. Burton, finding that Plaintiff's condition was essentially unchanged, opined that he "did not have anything new to add to his treatment," which "appeared to be more of a chronic pain syndrome, fibromyalgia, causalgia or that type of issue" (Tr. 118). He concluded that Plaintiff could never "return to productive work" (Tr. 118). In March, 2004, Plaintiff underwent an examination by his family physician at the request of his attorney (Tr. 164). Timothy Oliver, M.D. opined that he had "no solution to offer him" aside from prescribing Celebrex (Tr. 164). January, 2005 physical therapy notes state that Plaintiff "demonstrates gradual improvement and there is potential to improve further" (Tr. 178). In January and February, 2005, Dr. Oliver prescribed Cymbalta and Celexa (Tr. 176-177). In February, 2005, Plaintiff reported adverse effects from both medications (Tr. 175-176). Oliver noted that Plaintiff was not taking any depression medication, but reported that he did "not feel depressed" (Tr. 175). The same month, Dr. Burton submitted an opinion letter to Plaintiff's attorney, stating that Plaintiff continued to experience swelling, a limited range of motion, and decreased fine motor skills in the right hand (Tr. 173). He concluded that since Plaintiff's "x-rays have never shown any diagnostic changes . . . it is unlikely he will see any improvement and in fact, I believe it is likely his

symptoms will increase" (Tr. 173).

### 2. Consultive and Non-examining Sources

In November, 2003, Samiullah H. Sayyid, M.D. examined Plaintiff on behalf of the SSA (Tr. 124-130). Plaintiff reported that he developed reflex sympathetic dystrophy after sustaining an air gun injury (Tr. 124). Sayyid noted that Plaintiff had undergone physical therapy and was currently under the care of a orthopedic surgeon (Tr. 124). Plaintiff reported that he had stopped taking narcotics and muscle relaxant after developing side effects (Tr. 124). Other than "some weakness of 4/5 of the right upper extremity," Sayyid observed "grade 5/5 muscle tone, bulk and strength" (Tr. 125). Sayyid found the presence of right hand limitations (Tr. 128).

A Residual Functional Capacity Assessment performed the same month found that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; and push and/or pull without limitation (Tr. 134). The report found that Plaintiff was limited to occasional handling, fingering, or feeling with the right hand, but found a complete absence of postural, visual, communicative, or environmental limitations (Tr. 135-137).

### C. VE Testimony

VE Heather Benton classified Plaintiff's past relevant work as a computer salesperson as skilled at the light level of exertion; hardware salesperson as semi-skilled and exertionally medium; automotive assembler as unskilled and light; and optical work as a prescription clerk as skilled and light (Tr. 231-232).

The ALJ then posed the following hypothetical question:

> "Assuming we have an individual who is restricted to light work, should do no pushing or pulling with his right upper extremity, and no handling or fingering with his right hand. Avoid all exposure to extreme cold. Should have only brief and superficial contact with the general public. Could such a person do any of the claimant's past relevant work?

(Tr. 232). The VE found that given the above limitations, Plaintiff would be unable to perform any of his former jobs but retained the capacity to perform the light, unskilled work of an inspector (5,000 jobs in the lower peninsula of Michigan) and sorter (1,000) (Tr. 233). She testified further that if Plaintiff were restricted to sedentary work precluding the use of vibratory tools, the number of inspector positions would be reduced to 1,000 and the sorter jobs to 700 (Tr. 233). She also found that he could perform the sedentary work of a surveillance system monitor (2,100). The VE testified that if Plaintiff's allegations were fully credited, he would be unable to perform any of the above jobs due to medication side effects and the need for bed rest for 10 days of each month (Tr. 234). The VE stated that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") as well as the Employment Statistics Quarterly, the Occupation Industry Outlook, the Michigan Occupational Employment and her own experience (Tr. 234).

### D. The ALJ's Decision

ALJ Hartman found that although Plaintiff's reflex sympathetic dystrophy, status-post right upper extremity injury, fibromyalgia, and depression were "severe" impairments based 20 C.F.R. § 404.1520(c), none of the conditions met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation 4 (Tr. 24, 27).

The ALJ determined that although Plaintiff's exertional limitations prevented him from performing his past relevant work, he retained the residual functional capacity for

> "unskilled sedentary work with no pushing/pulling, handling, or fingering with the right upper extremity; with no use of vibratory tools; with no exposure to extreme cold; and with no more than brief, superficial contact with the public"

(Tr. 25,27). The ALJ adopted the VE's findings that Plaintiff could perform the work of a sorter (700 jobs), inspector (1,000), and surveillance monitor (2,100) (Tr. 25).

The ALJ found Plaintiff's allegations of disability "not totally credible," noting "a paucity of objective medical evidence of record to document the existence of any medically determinable impairment that could possibly cause the severe, totally disabling symptomatology that is alleged" (Tr. 25, 27). She also noted Plaintiff's regular activities included meal preparation, laundry chores, cleaning, shopping, reading, and child care (Tr. 26).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated*

*Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the

residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. Credibility

Plaintiff faults the ALJ for discounting his allegations of disability, arguing that his ability to perform household and yard chores on an intermittent basis should not be used to discredit his testimony. *Plaintiff's Brief* at 6-14; *Walston v. Gardner*, 381F.2d 580, 586 (6th Cir. 1967). He contends that as a result, the hypothetical question posed to the VE did not encompass all of his work-related limitations. *Id.* Citing *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir. 1987), he also contends that the question's omissions tainted the VE's findings that he could perform limited range of sedentary work. *Id.* at 9.

In *Varley,* 820 F.2d at 779, the court held that "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays the plaintiff's individual physical and mental impairments." (internal citations omitted). The ALJ's credibility determination impacts the composition of a hypothetical question. The deference allotted to the ALJ's credibility determination is extended to the hypothetical question. "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994); *Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987).

Contrary to Plaintiff's contention, the ALJ supported her credibility determination with ample record evidence. Citing Plaintiff's own testimony, the ALJ noted Plaintiff's *regular* (as opposed to intermittent) activities included preparing meals, vacuuming, shopping, reading, and child care (Tr. 26). She also found that Plaintiff's allegations of disability stood unsupported by his medical records, finding "a paucity" of evidence to substantiate his claims (Tr. 26).

Addition evidence found throughout the record stands at odds with Plaintiff's claims. Plaintiff acknowledged that he continued to perform yard work, take "fly fishing" trips, and managed to keyboard by using his left hand (Tr. 224-229). Consultive examination notes indicate that he maintained "grade 5/5 muscle tone, bulk and strength" (Tr. 125). Even within months of Plaintiff's 1995 injury, Dr. Hankin noted that a bone scan "demonstrated no marked changes consistent with a reflex dystrophy or fracture,""normal x-rays" of Plaintiff's wrist, and an absence of right forearm atrophy (Tr. 141-142). An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record.'" *Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989); *Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986). Here, the ALJ's credibility findings, well articulated and supported by an abundance of record evidence, should be upheld.

**B. Severe Impairment of Depression**

Plaintiff argues next that the ALJ committed reversible error by failing to conduct a proper evaluation of his depression. *Plaintiff's Brief* at 15-16. He cites 20 C.F.R. §404.1520a, which requires the administrative decision to include "a specific finding as to

the degree of limitation" as to daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. *Id.* at 15; 20 C.F.R. §404.1520a (c). "When a record contains evidence of a mental impairment that allegedly prevented claimant from working, the Secretary is required to follow the procedure for evaluating the potential mental impairment set forth in his regulations and to document the procedure accordingly." *Andrade v. Secretary of Health and Human Services,* 985 F.2d 1045, 1048 (10th Cir.1993)(internal citations omitted); 20 C.F.R. § 404.1520a. The ALJ's findings "must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section." 20 C.F.R. §404.1520a (e)(2). These findings and conclusions are documented in a standard form–the Psychiatric Review Technique Form, or PRTF–that describes the application of the prescribed technique.

Where, as in the present case, a claimant fails to include mental impairments in his application, but later alleges a substantial degree of such limitation, the administrative decision must nonetheless contain the required analysis. *See Owen v. Chater,* 1997 WL 251918, *4 (6th Cir. 1997) ("[W]here a claim of mental impairment arises for the first time in proceedings before the ALJ, the ALJ would have an obligation to consult a mental health expert before completing the PRTF if the claimant brings forth sufficient evidence to raise an inference that he suffers from a mental impairment.").

In the present case, the ALJ made a specific finding at Step Two of the sequential analysis that Plaintiff's depression was a "severe impairment." Having made that determination, the ALJ was required to perform the mental limitations analysis set forth in

20 C.F.R. §404.1520a.² That Regulation's "'special technique' is not only used to determine severity but also to determine the 'functional consequences of the mental disorder(s) relevant to the complainant's ability to work.'" *Witt v. Barnhart,* 446 F.Supp.2d 886, 898 (N.D.Ill. 2006); 20 C.F.R. § 404.1520a. "[I]t is worth noting that one of the stated purposes for the special technique is to help the Social Security Administration organize and present its findings in a clear, concise, and consistent manner." *Selassie v. Barnhart* 203 Fed.Appx. 174, 176 (9th Cir. 2006) (internal citations omitted); 20 C.F.R. § 404.1520a(a)(3). "The specific documentation requirements . . . are not mere technicalities that can be ignored as long as the ALJ reaches the same result that it would have if it had followed those requirements." *Selassie,* at 176. Here, the ALJ's failure to consider the nature and degree of Plaintiff's mental limitations allows for the possibility that the RFC does not fully account for his deficiencies.

While this record does not justify a remand for an award of benefits, *see Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994),³ a remand is nonetheless required for an analysis

---

² In *Keys v. Barnhart* 430 F.Supp.2d 759, 772 (N.D.Ill.2006), the court interpreted the Regulation to require the analysis even upon finding that the mental limitation is non-severe.

³*Faucher* holds that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."

of Plaintiff's mental limitations as required by 20 C.F.R. §404.1520a, as well as for the general principle that an ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Lowery v. Commissioner, Social Sec. Administration,* 55 Fed.Appx. 333, 339, 2003 WL 236419, *5 (6th Cir. 2003); *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir.1995).

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment GRANTED to the extent that the case be remanded for an analysis of Plaintiff's mental limitations as required by 20 C.F.R. §404.1520a.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen<br>
R. STEVEN WHALEN<br>
UNITED STATES MAGISTRATE JUDGE

Date: October 31, 2007

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, October 31, 2007, by electronic and/or ordinary mail.

s/Susan Jefferson<br>
Case Manager and Deputy Clerk<br>
(313) 234-5115